IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ING BANK, FSB.,                )
                               )
          Plaintiff,           )
                               )
     v.                        ) Civ. No. 09-CV-897-SLR
                               )
AMERICAN REPORTING             )
COMPANY, LLC                   )
                               )
                               )
          Defendant.           )

---

Gary William Lipkin, Esquire and Matt Neiderman, Esquire of Duane Morris LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: James L. Beausoleil, Jr., Esquire and Anothony L. Gallia, Esquire of Duane Morris.

Louis J. Rizzo, Jr., Esquire of Reger Rizzo Kavulich & Darnall, LLP, Wilmington, Delaware. Counsel for Defendant.

---

**MEMORANDUM OPINION**

Dated: February 16, 2012
Wilmington, Delaware

*[signature]*
ROBINSON, District Judge

## I. INTRODUCTION

On November 24, 2009, ING Bank ("ING") filed suit against Dana Palmer/Team One Appraisals ("Palmer") and American Reporting Company ("ARC") (collectively "defendants"). (D.I. 1) Dana Palmer is the president of Team One Appraisals, a Washington-based real estate appraisal business. (*Id.* at ¶¶ 4-5) ARC is also a Washington-based real estate appraisal company. (*Id.* at ¶¶ 6-7)

The complaint alleges that ING suffered a significant financial loss as a result of a faulty appraisal done by defendants. (*Id.* at ¶¶ 7-20) Specifically, the complaint sets forth counts of negligence, professional negligence and negligent misrepresentation against Palmer and ARC; the complaint also sets forth a breach of contract claim against ARC. (*Id.* at 4-13)

On January 5, 2010, Palmer filed a motion to dismiss for lack of personal jurisdiction. (D.I. 8) The court granted the motion and Dana Palmer/Team One Appraisals were dismissed. (D.I. 18)

Currently before the court is ARC's motion for summary judgment. (D.I. 65) ING has responded.[1] (D.I. 73) The court has jurisdiction pursuant to 28 U.S.C. § 1332. For the reasons discussed below, the court denies ARC's motion.

## II. BACKGROUND

According to ARC, it is a "small appraisal management company of less than 25 employees serving lenders . . . by locating qualified real estate appraisers in a specific

---

[1] Also at issue is plaintiff's motion for leave to file a sur-reply brief in opposition to ARC's reply brief. (D.I. 81) There being no objection, the motion is granted.

2

region of the country to supply real estate appraisal services on the terms set forth by the lenders." (D.I. 66 at 3) ING disputes ARC's characterization of itself as a small company, claiming that ARC "employed over 100 contracted appraisers throughout Washington, Oregon, Idaho and Utah from 2006 - 2009." (D.I. 73 at 3) Regardless of the characterization, both ING and ARC acknowledge that they entered into a September 19, 2005 Service Agreement ("Service Agreement") whereby ARC would supply ING with real estate "appraisal services." (D.I. 66 at 3; D.I. 73 at 3; D.I. 67 at 72)

Under the terms of the Service Agreement, "appraisal services" were defined as "the provision by [ARC] of appraisals[2]" that conformed to both industry specific standards, set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP"), and ING-specific requirements, set forth in ANNEX 2 of the Service Agreement. (D.I. 67 at 72) One of the specific requirements set forth in Annex 2 related to the qualification of appraisers hired by ARC. According to Section 9 of Annex 2, ARC could only use "licenced or certified appraisers with a minimum of five years experience" who had "a good working knowledge of the market area in which [a] subject property is located." (*Id.* at 83)

One of the appraisers that ARC utilized in Washington state was Palmer. Under the ARC-Palmer contract, Palmer was considered an "Independent Contract Appraiser."

---

[2] Appraisals were defined as "a written statement independently and impartially prepared by a qualified appraiser setting forth an opinion as to the market value of an adequately described property as of specific dates, supported by the presentation and analysis of relevant market information." (D.I. 67 at 72)

3

(D.I. 67 at 86)[3]

ING tasked ARC with appraising a property owned by Ms. Ginger Long ("Long"), located at 27120 110th Avenue East in Graham, Washington. (D.I. 67 at 88) ARC utilized Palmer as the individual appraiser for this job. (*Id.* at 90; D.I. 74 at 158) According to a February 5, 2008 appraisal by Palmer, the property was worth $2,300,000. (*Id.*) Palmer's appraisal was reviewed for accuracy and reasonableness by both ARC (D.I. 67 at 124) and ING (*Id.* at 112-15; 138-45). After receiving this appraisal, ING originated a mortgage refinance loan to Long in the amount of $1,610,000; the loan was secured by a lien on the 27120 110th Avenue East property. (D.I. 74 at 2) The parties dispute whether ING complied with its own underwriting guidelines and federal loan regulations when it originated this loan.

At some point, Long became delinquent on her loan payments. In the wake of her delinquency, ING had her property reappraised. According to a June 4, 2009 reappraisal, the 27120 110th Avenue East property was only worth $690,000.[4] Given the sizable difference between the original Palmer appraisal (done in February of 2005) and the reappraisal (done in June of 2009), ING hired Gary G. Walker to perform a

---

[3] While ARC cites to a contract titled "Service Agreement - Independent Contact Appraiser," the court notes that this agreement does not contain Palmer's signature or that of ARC. It is simply a generic agreement.

[4] ING has not pointed the court to support for this last proposition. Because ARC does not appear to dispute the occurrence of or the conclusion of this reappraisal, and because its inclusion helps paint a coherent narrative of events, the court has included it above.

4

retroactive review[5] of the subject property. Mr. Walker's review indicated that the subject property was only worth $740,000 in February of 2005. (D.I. 74 at 238) According to ING's expert Ronald Hoeffer, who reviewed the original appraisal as well as Mr. Walker's retroactive review, Palmer's original appraisal "contained numerous mistakes and miscalculations" and also "violated industry and ING standards." (D.I. 73 at 6) (citing D.I. 74 at 212-14; 227-30) In the wake of this reappraisal, it also became apparent that Palmer did not have the five years of experience required by ANNEX 2 of the parties' Service Agreement; she had only been certified for approximately one year prior to performing the 27120 110th Avenue East appraisal. (*Id.* at 122; 214)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3rd Cir. 1995) (internal citations omitted). If the moving party has

---

[5] A "retroactive review" appears to be a term of art utilized in the appraisal business. When an appraiser performs a "retro review," they are providing an estimate of the property's value on the date of the original appraisal. In essence, a retro review is a critique of the first appraisal.

5

demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3rd Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

ARC argues that all claims against it should be dismissed. With respect to the negligence claims, ARC argues: 1) it cannot be vicariously liable for the negligence of its independent contractor; and 2) negligence claims are barred by ING's contributory negligence. With respect to the breach of contract claim, ARC contends that it complied with all the requirements set forth in the Service Agreement. Lastly, assuming its motion to dismiss is not granted on all counts, ARC argues that ING cannot prove its damages.

### A. ARC's Liability for the Negligence of Palmer

In *Fisher v. Townsends, Inc.*, 695 A.2d 53, 58 (Del. 1997), the Delaware

Supreme Court explained that "two general rules establish the framework for determining vicarious liability." The first rule is that, "if the principal is the master of an agent who is a servant, the fault of the agent, if acting within the scope of employment, will be imputed to the principal by the doctrine of *respondeat superior.*" Id. The second is that "an owner or contractee will not be held liable for the torts of an independent contractor which are committed in the performance of the contracted work." Id. Thus, a determination of whether a party is a servant or an independent contractor is key to any liability determination.

Under Delaware law, "[i]f the principal assumes the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract, a master/servant type of agency relationship has been created[;] [i]f, however, [a] worker is not subject to that degree of physical control, but is subject only to the general control and direction by the contractee, [that] worker is termed an independent contractor." Id. at 59. In other words, the "right to control" is a central consideration for any servant/independent contractor analysis. Id; Kulp v. Mann-Beebe, Civ. No. 06c-01-031 WLW, 2008 WL 4120041, at *3 (Del. Super. 2008) However, the degree of control exercised by a principal is not the only consideration. The Delaware Supreme Court has recognized the Restatement (Second) of Agency § 220 as an "authoritative source for guidance" in determinations on whether a person who acts for another is a servant or independent contractor. Id. Section 220 provides the following nonexclusive list of factors that should be considered in any servant/independent contractor analysis:

7

(a) the extent of control, which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.

ARC argues that it cannot be held vicariously liable for the tortious actions of Palmer since Palmer was an independent contractor.[6] (D.I. 66 at 6-7) According to ARC, there is no dispute that Palmer was an independent contractor since: 1) Palmer entered into a "Independent Contract Appraiser" Service Agreement with ARC; and 2) Palmer testified to being an "independent contractor" of ARC. (D.I. 66 at 6) (citing D.I. 67 at 86; 156)

While ARC asks the court to deem Palmer an independent contractor based upon Palmer and ARC's designation as such, that would be improper. Although the intent of the parties is a relevant factor, "the label by which parties to a relationship designate themselves is not controlling." *Fisher*, 695 A.2d at 60 (quotations and citations omitted). The determination that a party is an independent contractor as

---

[6] ARC asserts that there are no allegations of direct negligence made against it and counts IV (negligence), V (professional negligence/appraisal malpractice) and VI (negligent misrepresentation) only allege vicarious liability. ING does not dispute this characterization.

8

opposed to a servant is ordinarily a matter of fact resolved by the ultimate factfinder after an analysis of the above-discussed factors; it is not ordinarily an issue appropriately resolved at summary judgment. *Id.* at 59-61 ("It is the actions taken by the parties, not the terms used in the contract that are dispositive" in determining the type of relationship that existed). This case is no different. While ARC and Palmer indicated that they believed Palmer to be an independent contractor, other facts of record suggest that this relationship is more appropriately characterized a master/servant type relationship. (D.I. 73 at 9-10) (noting that ARC required Palmer to perform the appraisal in a specific fashion, ARC worked with Palmer from 2007 until 2009, and ARC was in the business of performing appraisals) Accordingly, any servant/independent contractor determination will be made by a jury at trial.

Furthermore, the court notes that, even if Palmer is determined to be an independent contractor, that does not necessarily resolve the issue of liability. In Delaware, exceptions exist to the general rule that owners and contractees cannot be held liable for torts committed by independent contractors. *Fisher*, 695 A.2d at 60. For example, "if an owner or contractee's control dominates the manner or means of the work performed" by the independent contractor, the owner or contractee can be held vicariously liable. *Id.* at 61.

### B. Contributory Negligence

According to 10 Del. C. § 8132:

In all actions brought to recover damages for negligence which **results in death or injury to person or property**, the fact that the plaintiff may have been contributorily negligent shall not bar a recovery by the plaintiff or the plaintiff's legal representative where such negligence was not greater than

9

the negligence of the defendant or the combined negligence of all
defendants against whom recovery is sought, but any damages awarded
shall be diminished in proportion to the amount of negligence attributed to
the plaintiff.

10 Del. C. § 8132 (emphasis added). ARC contends that professional malpractice cases fall outside of the scope of the comparative negligence act - since they do not involve death, bodily injury or damage to property - and, therefore, the doctrine of contributory negligence remains applicable in such cases. (D.I. 66 at 7-8)[7] ARC then argues that ING's negligence claims are barred as a result of its own contributory negligence. Specifically, ARC claims that ING was contributorily negligent by providing Long with a loan in violation of both ING's own underwriting guidelines and federal lending regulations. (D.I. 66 at 7-13) ING counters ARC's position by arguing that factual issues preclude the entry of summary judgment. (D.I. 73 at 13-15) The court agrees with ING's position.

### 1. ING's underwriting guidelines

ARC first argues that ING was contributorily negligent because it failed to comply with its own underwriting guidelines. ING's December 31, 2007 Residential Underwriting Guidelines ("RUG") permit loans to be originated without an applicant's income being verified. (D.I. 67 at 200) For a loan to be generated under this No

---

[7] ARC acknowledges that no Delaware court has opined on the scope of Delaware's comparative negligence statute; however, ARC notes that Pennsylvania has adopted an almost identically worded comparative negligence statute and the Pennsylvania Superior Court has held that, since professional malpractice cases do not involve death, bodily injury or damage to property, the doctrine of contributory negligence remains applicable. (D.I. 66 at 7-8) (citing *Gorski v. Smith*, 812 A.2d 683, 702 (Pa. Super. 2002) and *Columbia Medical Group, Inc. v. Herring & Roll, P.C.*, 829 A.2d 1184, 1192 (Pa. Super. 2003)) ING does not dispute ARC's interpretation of the statute.

10

Income Verification ("NIV") program, an applicant must meet certain minimum requirements. One such requirement is that self-employed applicants must prove that they have been self-employed for at least five years; they must do this with certain enumerated forms of proof. (*Id.*) Another requirement is that income must be verified when the refinanced loan payment is 90% or more of the applicant's current payment. (*Id.* at 201) ARC argues that ING failed to comply with its own RUG by originating Long's loan under the NIV program without properly verifying Long's employment history or income. (D.I. 66 at 9)

ING does not contest the fact that it did not properly verify Long's employment status or income under the requirements set forth in the RUG; instead, ING responds by pointing the court to its January 8, 2008 Secured Mortgage Lending Guidelines ("SMLG"). ING contends that Long's loan was originated under these guidelines and not the RUG. (D.I.73 at 7; 13) Under ING's SMLG, a NIV program also existed. (D.I. 74 at 383) Like the NIV program in the RUG, the SMLG also required: 1) self-employed applicants to prove that they had been self-employed for at least five years; and 2) income verification when the refinanced loan payment is 90% or more of the applicant's current payment. (*Id.* at 384-85) Unlike the RUG, however, the SMLG expressly stated that exceptions to the SMLG "may be made at the discretion of the Underwriter based upon documented compensating factors." (*Id.* at 378) Compensating factors included, but were not limited to, "low loan values," "high credit scores," and "length of time on the job." (*Id.*) According to ING, an underwriter could have and did properly invoke his discretion under the SMLG based on several compensating factors present in Long's loan application, including Long's high credit

11

score (733), her length of employment (6 years), and the loan's low value ($1,600,000 compared with appraised value of the property - $2,300,000). (*Id.*)

In short, the parties dispute which set of underwriting guidelines was applicable to the Long loan - the RUG or the SMLG. While ARC argues that Andrew Bough ("Bough"), an ING executive, testified that the RUG were exclusively applicable to the Long loan, that is not an accurate representation of Bough's testimony. A fair reading of Bough's deposition testimony suggests that he was uncertain about which set of guidelines was applicable. (D.I. 74 at 442-43) After being deposed, Bough signed an affidavit in which he swore that the SMLG were applicable to the Long loan. (D.I. 74 at 1-4) Because a genuine issue of material fact exists with respect to which set of underwriting guidelines applied to Long's loan, summary judgment is not appropriate.

### 2. Section 226.34 of the Truth In Lending Act

ARC also argues that ING negligently originated the Long loan in violation of Section 226.34 of the Truth in Lending Act. According to 12 C.F.R. § 226.34(a)(4), creditors extending mortgage credit subject to § 226.32 (dealing with consumer credit transactions secured by a consumer's principal dwelling) shall not "[e]xtend credit subject to § 226.32 to a consumer based on the value of the consumer's collateral without regard to the consumer's repayment ability as of consummation, including the consumer's current and reasonably expected income, employment, assets other than the collateral, current obligations, and mortgage-related obligations." As ING points out, however, this specific regulation was not effective until October of 2009, approximately nineteen months after the Long loan was originated. The text of the regulation effective

12

at the time the Long loan was originated was: "[A lender cannot e]ngage in **a pattern or practice** of extending credit subject to § 226.32 to a consumer based on the consumer's collateral without regard to the consumer's repayment ability, including the consumer's current and expected income, current obligations, and employment. There is a presumption that a creditor has violated this paragraph (a)(4) if the creditor engages in a pattern or practice of making loans subject to § 226.32 without verifying and documenting consumers' repayment ability." 12 C.F.R. § 226.34(a)(4) (emphasis added). Because a genuine issue of fact exists with respect to whether ING negligently engaged in a pattern or practice of extending credit without regard for a borrower's ability to repay, summary judgment is not appropriate.[8]

### C. ARC's Compliance with the Service Agreement

ARC asserts that it complied with all the terms set forth in the Service Agreement and, therefore, summary judgment is appropriate on ING's breach of contract claim. (D.I. 66 at 13-16) In order to make this argument, ARC asserts that the course of conduct between ING and ARC amended the appraiser experience provision in Annex 2. (D.I. 66 at 16-17) ARC notes that Palmer had submitted twenty-one ING appraisals prior to the Long appraisal and on each one of these she attached a copy of her Washington state appraisal certificate which indicates a March 1, 2007 issuance date.[9] (D.I. 67 at 222-23) Based upon ING's failure to object to any Palmer appraisal, ARC

---

[8] ARC, in its reply brief, does not dispute that the regulation they cited was not the version effective at the time Long's loan was originated, nor does ARC argue that ING engaged in a pattern or practice of extending credit without regard for a borrower's repayment abilities. (D.I. 77)

[9] She had submitted a total of 311 ING appraisals between 2007 and 2009.

13

contends that the appraiser experience provision was modified by the parties' conduct. ARC cites *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28 (Del. 1972), in support of its position. In *Pepsico*, independent bottlers sued Pepsi for declaratory judgment. *Id.* at 29-30. The bottlers sought to establish that Pepsi's increase in the price of a unit of concentrate violated a pricing provision in their agreements. *Id.* Pepsi defended by noting that the price of a unit identified in the original agreement had increased nine times over the years and the bottlers had acquiesced to these increases. *Id.* at 31-32. The Supreme Court of Delaware, siding with Pepsi, held that the parties could modify the terms of the contract by their course of conduct. *Id.* at 33.

ING responds to ARC position by noting that a "course of conduct modification to a written contract 'must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they have previously solemnized by formal documents.'" (D.I. 78 at 18) (citing *Reeder v. Sanford Sch., Inc.*, 397 A.2d 139, 141 (Del. Super. 1979)) Indeed, Delaware courts have established a "high evidentiary burden" for parties asserting course of conduct modifications. *Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000); *see also Haft v. Dart Group Corp.*, Civ. No. 93-384, 1994 WL 828326, 12 (D. Del. 1994) ("Written contracts can be modified by unwritten conduct on the part of the parties. The burden is on the party seeking the modification to demonstrate that a contract has been modified. Plaintiff must also demonstrate that the modification is of such specificity as to leave no doubt as to the intention of the parties.") (citations and quotations omitted); *Continental Ins.*

14

*Co. v. Rutledge & Co., Inc.*, No. Civ. A. 15539, 2000 WL 268297, at *3 (Del. Ch. 2000).

Whether or not ARC has met this burden remains an issue of fact for the jury to decide. While ARC argues that the 2007 issuance date on the certificate constitutes proof of Palmer's inexperience under the terms of the Service Agreement, that is not necessarily the case. As ING explains, a certificate's issuance date does not, as a matter of course, reflect an individual's number of years of appraisal experience. (D.I. 73 at 19) (citing D.I. 74 at 6)

### D. Damages

Because issues regarding damages and the admissibility of expert witness testimony on damages have been more fully briefed and comprehensively addressed in the parties' motions in limine, these issues will be addressed in the context of those motions.

## V. CONCLUSION

For the reasons discussed above, the court denies ARC's motion for summary judgment. An appropriate order shall issue.